# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

SEP 16 2016

David J. Bradley, Clerk of Court

[UNDER SEAL],

v.

[UNDER SEAL].

Filed in Camera
and Under Seal

Civil Case No. _16 CV 2800_

**DO NOT PLACE ON PACER**
**DO NOT SERVE DEFENDANTS**
**DO NOT PLACE IN PRESS BOX**

# <u>FILED UNDER SEAL</u>

# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel. SYNERGY RELATORS** | § § § | **Filed in Camera and Under Seal** |
| **Relators,** | § § § | **Pursuant to 31 U.S.C. § 3730(B)(2)** |
| **v.** | § § | |
| **ADVANCED HEALTHCARE SOLUTIONS; TEDDY LICHTSCHEIN; ELIZER SCHEINER; REHAB SYNERGIES, LLC; TEXAS OPERATIONS MANAGEMENT, LLC; BALCH SPRINGS SNF LLC; BAY OAKS SNF LLC; BAYLOR SNF LLC; BELLMIRE SNF LLC; BENBROOK SNF LLC; BIRMINGHAM SNF LLC; BLUEBONNET SNF LLC; BOWIE SNF LLC; BRADY WEST SNF LLC; CLARKSVILLE SNF LLC; CLYDE SNF LLC; COLONIAL MANOR SNF LLC; COURTYARD SNF LLC; CROCKETT SNF LLC; CROWELL SNF LLC; EL PASO SNF LLC; GARDENDALE SNF LLC; GARLAND SNF LLC; GRANBURD SNF LLC; GREEN OAKS SNF LLC; GREENVILLE SNF LLC; HENDERSON SNF LLC; KELLER SNF LLC; LUBBOCK NH SNF LLC; MCALLEN SNF LLC; MESQUITE NH SNF LLC; MONTEREY SNF LLC; MUNDAY SNF LLC; PALO PINTO SNF LLC; PARIS SNF LLC; PARK VIEW SNF LLC; PINECREST SNF LLC; PITTSBURG SNF LLC; PRAIRIE HOUSE SNF LLC; RENAISSANCE SNF LLC; RIVER** | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | **Civil Action No. _____**<br><br>**DO NOT PLACE ON PACER**<br>**DO NOT SERVE DEFENDANTS**<br>**DO NOT PLACE IN PRESS BOX** |

OAKS SNF LLC; ROSENBERG SNF §
LLC; RUSK SNF LLC; SANTE FE SNF §
LLC; SOUTHEAST SNF LLC; §
STONEBROOK MANOR SNF LLC; §
SULPHUR SPRINGS SNF LLC; §
TOMBALL SNF LLC; VERNON SNF §
LLC; VISTA HILLS SNF LLC; WACO §
SNF LLC; WEDGEWOOD SNF LLC; §
WHISPERING OAKS SNF LLC; §
WHITE SETTLEMENT SNF LLC; §
WHITEHALL SNF LLC; WILLOW §
SNF LLC; WINFIELD SNF LLC; and §
WICHITA FALLS SNF LLC §

**Defendants.**

## RELATORS' ORIGINAL COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *et seq.*, AND DEMAND FOR JURY TRIAL

1. This is an action under the federal False Claims Act ("FCA") by five rehabilitation therapists who sue on behalf of the United States to recover damages and civil penalties arising from a fraudulent scheme in which the defendants Advanced Healthcare Solutions, Teddy Lichtschein, Elizer Scheiner, and 56 of their affiliates (herein collectively the "Defendants") caused the Medicare program to pay for therapy services that were unreasonable, unnecessary, unskilled or simply did not occur as Defendants reported them to have occurred.

2. The fraud commenced on approximately December 1, 2009, when Defendants Lichtschein and Scheiner purchased the first 37 of the 54 Texas skilled nursing facilities ("SNFs") at issue in this case, and continues unabated to the present.

3. Defendants' fraudulent scheme consists of purchasing poorly-performing but previously honest facilities and turning them around financially by (1) providing patients the most-expensive levels of care for which Medicare provides reimbursement, rather than providing

the levels of care most suitable for each patient's medical needs, and (2) causing therapists to report to Medicare more billable time than they actually spend providing therapy to patients.

4. The level of care in the Defendants' facilities is driven entirely by insurance reimbursement. Medicare Part A patients are presumptively scheduled for 75 minutes of therapy per day for at least two therapy disciplines, whereas Medicare Part B patients are scheduled for no more than 53 minutes per day and Medicaid patients are scheduled for no more than 23 minutes. The difference results not because Medicaid or Part B patients need less care than Part A patients, but rather because insurance reimbursements under Medicaid and Part B are less generous than under Medicare Part A. In many cases, the same patient receives different levels of therapy depending upon whether his care is currently being reimbursed under Medicare Part A, Medicare Part B or Medicaid.

5. The percentage of Part A patients receiving the highest level of treatment increased dramatically after Lichtschein and Scheiner's acquisition of the nursing facilities. Most of the Defendants' facilities were billing approximately 52% of their Part A patients at the Ultra High ("RU") and Very High ("RV") levels before Defendants purchased them on December 1, 2009. By 2014, the last year for which Medicare cost report data is available, the Defendants were billing approximately 87% of their Part A patients at the RU and RV reimbursement levels. The increase resulted not from any change in patient mix or patient need, but rather from Defendants' management practices, including an emphasis upon meeting targets for "Part A Rate," "RU%" (Ultra High percent) and "Missed Revenue" (that would have been generated if the maximum reimbursable minutes had been billed), all of which goals are communicated to the Defendants' therapy staff, *inter alia*, through Weekly Outcome Data

reports discussed in weekly conference calls.

6. Defendants have caused therapists to report more billable minutes than actually spent by imposing an unreasonable 90% to 95% productivity quota, which requires that all therapists report 90% to 95% of their paid time as billable therapy services on penalty of termination. By not allowing sufficient paid time for therapists to eat, take rest breaks, perform administrative duties or prepare required reports, the Defendants put overworked therapists to the choice of either working extra hours off the clock or including non-billable time in the minutes reported as billable therapy time. When questioned about the choice, management instructs the therapists to use a portion of their time reported as billable therapy to prepare required reports or perform other administrative duties. The necessary consequence of the productivity quota and related instruction is that Medicare is billed for time that is not actually spent providing skilled therapy services to patients, contrary to Medicare's express instructions.

7. By knowingly causing false or fraudulent claims to be submitted for unnecessary, unskilled or untrue services and by causing false statements or records to be used to get false claims paid by Medicare, Defendants have violated the False Claims Act.

## I. PARTIES

8. Plaintiff Synergy Relators is a Delaware general partnership that is not a legal entity distinct from its individual partners. The five partners of Synergy Relators (hereinafter "Relators") formed the partnership in order to avoid the disclosure of their identities and the loss of their livelihoods as rehabilitation therapists.

9. Relators have job duties that include physical, occupational and speech therapy. In a nursing home setting, physical therapists and their assistants work with patients who have

lost motor function due to illness or age to regain range of movement or overcome pain. Occupational therapists and their assistants work with nursing home patients to adaptively relearn ordinary tasks of daily living and increase their independence. Speech therapists assist patients in regaining speech and overcoming problems with eating and swallowing. As a result of pressure from the Defendants, the Relators often provide services that do not help their patients, and sometimes harm them, because the number of minutes of care for which they are scheduled by their employer is based upon the maximum that is reimbursable by Medicare, rather than the patients' actual medical needs, whether the patient can tolerate the maximum minutes or not.

10.     The allegations and transactions set forth in this complaint are based upon the personal knowledge of the Relators gained from their employment by Defendant Rehab Synergies at a SNF owned by Defendants Lichtschein and Scheiner and managed by Advanced Healthcare Solutions. Three of the Relators still work at that SNF and two of the Relators do not. Relators also have personal knowledge of practices at other facilities in the same chain of nursing homes operated by Defendants Advanced Healthcare Solutions, Lichtschein and Scheiner because they participate in regional conference calls, interact with employees at other facilities and occasionally see management reports concerning other facilities.

11.     There has been no public disclosure of the essential allegations or transactions set forth in this complaint prior to the filing of this action. However, if any such public disclosure has occurred, then in the alternative, the Relators qualify as original sources because (1) they have knowledge and information concerning such matters based upon personal experiences that is *independent* of any publicly disclosed allegations or transactions; (2) they have knowledge and

information concerning such matters that *materially adds* to any publicly disclosed allegations or transactions; and (3) they *fully disclosed* all material facts to the United States on or about September 6, 2016, prior to the filing of this complaint.

12.     Defendants Lichtschein and Scheiner are residents of the state of New York, who own, operate and control more than 100 SNFs in several states, including New York, Connecticut, Florida and Texas. Together, they jointly own a chain of approximately 54 Texas SNFs identified on **Exhibit A** which they operate under the name Advanced Healthcare Solutions through a Texas limited liability company known as Advanced HCS, LLC.

13.     In connection with their Texas SNFs, Lichtschein and Scheiner have organized at least 123 Texas limited liability companies ("LLCs") involved in every aspect of their Texas operations, including at least 54 LLCs that hold title to the real estate for the Texas facilities; 54 Texas LLCs enumerated on **Exhibit A** that hold licenses, National Provider Identifiers and Medicare Provider Numbers for the Texas SNFs; two management or operations LLCs known as Advanced HCS LLC and Texas Operations Management LLC, that provide centralized management and billing services for the Texas facilities from offices in Arlington, Texas; Monsey, NY; New City, NY; or Brooklyn, NY; and a rehabilitation services LLC known as Rehab Synergies LLC, which employs the Relators and the other rehabilitation therapists who provide rehab services at many of the 54 Texas facilities.

14.     Lichtschein and Scheiner's principal management entities in Texas share offices at 2121 Ave. J, Suite 103, Arlington, Texas 76006 (formerly 2225 E. Randol Mill Rd, Suite 600, Arlington, Texas 76011). Although Lichtschein and Scheiner employ a chief operating officer named Mary Pfeifer at Advanced Healthcare Solutions in Arlington, a chief operating officer

named Carmen Viton at Rehab Synergies in Arlington, a chief reimbursement officer named Cindi Hensarling in Arlington, and a chief financial officer named Zevi Kohn in New York, they employ no president or chief executive officer and perform the chief executive function in their capacities as the sole members and managers of their LLCs. Acting in that capacity, Lichtschein and Scheiner have personally caused the submission of false claims to the Government by those LLCs, making them jointly and severally liable to the United States for all of the false claims alleged herein. Lichtschein and Scheiner are also responsible, and the corporate existence of the SNF LLCs must be disregarded, because the SNF LLCs have been used by Lichtschein and Scheiner to perpetrate a fraud for their personal benefit.

15. Defendant Advanced HCS, LLC, doing business as Advanced Healthcare Solutions, is a Texas LLC owned and controlled by Defendants Lichtschein and Scheiner, which manages the SNF LLCs and is responsible for the false claims described herein because it caused the submission of those false claims. Its registered "principal office" and "principal place of business" are the office of Lichtschein and Scheiner located at 21 Robert Pitt Drive, Suite 212, Monsey, NY 10952, but it also shares a Texas office with Defendant Rehab Synergies, LLC at 2121 Ave. J., Suite 103, Arlington, TX 76006.

16. Defendant Texas Operations Management, LLC, is a Texas LLC owned and controlled by Defendants Lichtschein and Scheiner, which manages some or all of the SNF LLCs and is responsible for the false claims described herein because it caused the submission of those false claims. Its registered "principal office" and "principal place of business" are at 2071 Flatbush Ave., Brooklyn, NY 11234. Texas Operations Management is believed to share a Texas office with Defendants Advanced Healthcare Solutions and Rehab Synergies at 2121 Ave.

J, Suite 103, Arlington, TX 76006.

17.    Defendant Rehab Synergies, LLC, is a Texas LLC owned and controlled by Defendants Lichtschein and Scheiner which provides rehabilitation services in the 54 SNF facilities and is responsible for the false claims described herein because it caused the submission of those false claims.    Its registered "principal office" and "principal place of business" are at 368 New Hempstead Road, Suite 309, New City, NY 10956. Rehab Synergies shares with Defendant Advanced Healthcare Solutions a Texas office located at 2121 Ave. J, Suite 103, Arlington, TX 76006.

18.    The 54 SNF Defendants, whose legal names, tradenames and business locations are listed on **Exhibit A**, are owned and controlled by Defendants Lichtschein and Scheiner and are also responsible severally for the false claims described herein that were presented to Medicare on behalf of their particular facilities.    Each of the SNF Defendants has a Medicare Provider Number and National Provider Identifier with which it bills Medicare by means of a central billing office operated by Defendants Lichtschein and Scheiner, acting through the instrumentality of Defendants Advanced Healthcare Solutions and/or Texas Operations Management.

## II. JURISDICTION

19.    This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3730 and 28 U.S.C. §§ 1331 & 1345 and will obtain personal jurisdiction over all defendants, including Lichtschein and Scheiner, through the nationwide service of process permitted by 31 U.S.C. §3732(a).

20.    Venue is proper in this district and division pursuant to 31 U.S.C. §3732 and 28

U.S.C. § 1391(b) and (c) in that certain claims stated herein arose within this district and division, and certain acts of the Defendants which are the subject of this action occurred within this district and division. In addition, Defendants Lichtschein, Scheiner, Advanced HCS LLC, Texas Operations Management LLC, Rehab Synergies LLC, Courtyard SNF LLC, Rosenberg SNF LLC and Tomball SNF LLC transact business in this district and division.

## III. LEGAL BACKGROUND

### A. The False Claims Act

21. The FCA prohibits knowingly presenting, or causing to be presented, a false or fraudulent claim to the federal government for payment or approval. 31 U.S.C. § 3729(a)(1)(A). The FCA also prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim, *id.* at § 3729(a)(1)(B), as well as knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. *Id.* at § 3729(a)(1)(G).

22. A person acts "knowingly" under the FCA when he or she "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* at § 3729(b)(1)(A). No proof of specific intent to defraud is required by the FCA. *Id.* at § 3729(b)(1)(B).

23. FCA violations may result in civil penalties of between $5,500 and $11,000 per false claim ($10,781 - $21,563 for conduct after Nov 2, 2015), plus three times the amount of

damages sustained by the Government as a result of Defendants' illegal conduct. 31 U.S.C. § 3729(a).

## B. **Medicare**

24.     Medicare is a federally-funded health insurance program benefiting the elderly, disabled, and those afflicted with end-stage renal disease. 42 U.S.C. § 1395 *et seq.* It is administered by the Center for Medicare and Medicaid Services ("CMS"), a division of the Department of Health and Human Services ("HHS").

25.     The Medicare program is divided into four parts, each of which cover different services. Medicare Part A, or hospital insurance, covers inpatient hospital, home health, hospice, skilled nursing and rehabilitation services. Medicare Part B, or "supplementary medical insurance," generally covers medical expenses not covered under Part A, primarily physician and hospital outpatient expenses, but also rehabilitation services that are not covered by Part A.

26.     Medicare may not pay for any expense that is not "reasonable and necessary for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y (a)(1)(A).

27.     SNF rehabilitation services must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; must be consistent with accepted standards of medical practice; and must be reasonable in terms of duration and quantity. *See* Medicare Benefit Policy Manual, Ch. 8, § 30.25.

28.     SNFs submit Medicare claims to Fiscal Intermediaries ("FIs") and/or Part A/B Medicare Administrative Contractors ("MCAs"). 42 C.F.R. §§ 1395h, 1395kk-1.

### 1.     **Medicare Part A**

29.     Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care per benefit period (or spell of illness). A benefit period must follow a qualifying hospital stay of 3 or more consecutive days, and must start within 30 days of the hospital stay. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. §§ 409.61(b), (c), 409.30(b)(1).

30.     Medicare Part A SNF coverage is limited to beneficiaries who require skilled nursing or skilled rehabilitation services, or both, on a daily basis. 42 C.F.R. § 409.31(b)(1). "The daily skilled services must be ones that, as a practical matter, can only be provided in a SNF, on an inpatient basis." *Id.* at § 409.31(b)(3). The services must also be provided to address the condition for which the patient received treatment during a qualifying hospital stay, or for one that arose while the patient was receiving care at a SNF. *Id.* at § 409.31(b)(2). In addition, a physician, or certain nurse practitioners, clinical nurse specialists, or physician assistants, must certify and recertify that the SNF services meet the requirements above. 42 U.S.C. § 1395f(a)(2)(B).

31.     "To be considered a skilled service, the service must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a). Skilled therapy services means services that "(1) Are ordered by a physician; (2) Require the skills of technical or professional personnel such as registered nurses, licensed practical (vocational) nurses, physical therapists, occupational therapists, and speech pathologists or audiologists; and (3) Are furnished directly by, or under the supervision of, such personnel." 42 C.F.R. § 409.31(a); *see also* Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1.

32.     Personal care services and repetitious exercises to improve gait, or to maintain

strength and endurance, as well as assistive walking care are not skilled services. Medicare Benefit Policy Manual, Chapter 8, at § 30.4.1.2.

33.     Medicare Part A pays nursing facilities a daily rate to provide skilled nursing and skilled rehabilitation therapy services to qualifying Medicare beneficiaries. These Prospective Payment System ("PPS") payments are based on a pre-determined daily rate for each day of care. 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

34.     The daily payments to SNFs are determined by adjusting a base payment rate for geographic differences and case mix. The case-mix adjustment is done using "Resource Utilization Groups," or "RUGs," which account for different nursing and therapy weights. RUGs differ by the kinds of services the SNF furnishes to the patient (*e.g.,* the kind and amount of therapy), the patient's clinical condition, and the patient's need for assistance to perform activities of daily living.

35.     There are five rehabilitation RUG levels: Ultra High ("RU" for "RUG Ultra High"); Very High ("RV"); High ("RH"); Medium ("RM"); and Low ("RL"). SNFs classify patients into a RUG using information they gather in a standardized patient assessment instrument, the Minimum Data Set ("MDS"). A patient falls into a specific RUG level based on the number of skilled therapy minutes, and the kinds and numbers of therapy disciplines the patient received during a seven-day assessment or "lookback" period.

36.     RUG category requirements are set out below:

**RU:**   720 or more therapy minutes per week; at least 2 disciplines, with one discipline required at least 5 days/week (satisfied by 72 minutes per day, five days per week, for each of two disciplines).

**RV:**   500 or more therapy minutes per week; at least 1 discipline for

five or more days per week (satisfied by 50 minutes per day, five days per week, for each of two disciplines).

**RH:** 325 or more therapy minutes per week; at least 1 discipline provided five or more days per week (satisfied by 32.5 minutes per day, five days per week, for each of two disciplines).

**RM:** 150 or more therapy minutes per week; 5 days per week of any combination of disciplines (satisfied by 30 minutes per day, five days per week, for one discipline).

**RL:** 45 or more therapy minutes per week; 3 days per week of any discipline (satisfied by 15 minutes per day, three days per week, for each of one discipline).

37. The above-listed RUGs are further categorized based on ADL scores, which evaluate daily living activities such as eating, toileting, and mobility, and whether the patient requires extensive services.

38. The RUG system "uses minimum levels of minutes per week as qualifiers for classification into the rehabilitation therapy groups. These are minimums and are not to be counted as upper limits for service provision." 64 Fed. Reg. 41,644, 41,662 (July 30, 1999).

39. Medicare Part A pays the most for patients that fall into the RU category. This level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. at 26,258.

40. SNFs are required to assess and complete the MDS form on – or, in some cases, before or after – the 5th, 14th, 30th, 60th, and 90th days of the patient's Part A stay. 42 C.F.R. § 413.343. These dates are referred to as "assessment reference dates" or "ARDs." The assessment looks at the seven days preceding the ARD, "looking back" at the amount and kinds of therapy the patient required. This information is put in the "Special Treatments, Procedures, and Programs" section of the MDS (Section P of the MDS 2.0, and Section O of MDS 3.0), and

directly impacts the rehabilitation RUG level – and therefore the SNF's payment – to which the patient is assigned.

41.     Providers completing the MDS must certify that it "accurately reflects resident assessment information" and that "this information was collected in accordance with applicable Medicare and Medicaid requirements." They must also certify that "I understand that this information is used as a basis . . . for payment from federal funds . . . [and that] payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information."

42.     Currently, SNFs must transmit the data directly to CMS within 14 days of the assessment. 42 C.F.R. § 483.20(f)(3), *id.* at § 413.343(a). Prior to October 1, 2009, SNFs electronically transmitted the MDS form to a state's health department or other agency, 42 C.F.R. § 483.20(f)(3) (2006), which in turn sent the data to CMS.

43.     Truthful completion and submission of the MDS is a condition of payment, *see* 63 Fed. Reg. at 26,265, 42 C.F.R. § 413.343(a), and is material to the government's payment decision.

44.     The RUG score is also incorporated into a Health Insurance Prospective Payment System (HIPPS) Code, a 5-character code, consisting of the 3-digit RUG score and a 2-digit assessment indicator, used solely to bill Medicare for the Part A SNF stay. *See* Medicare Claims Processing Manual, Ch. 25, § 75.5. The HIPPS code is filled out on the MDS as well as electronically submitted as a claim for payment to CMS on the CMS-1450 form or the electronic version thereof. The CMS-1450 form is submitted electronically to the appropriate Medicare Administrative Contractor, which processes and pays the Medicare claim.

45.     CMS-1450 requires providers to certify that the information is "true, accurate, and complete" and "[t]hat the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." It also states that "MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)." Form CMS-1450 (emphasis in original).

46.     Prior to the commencement of therapy in any discipline, a therapist certified in that discipline must evaluate the patient and develop a treatment plan that is approved by a physician. *See* 64 Fed. Reg. at 41, 660-61; 42 C.F.R. §§ 409.17, 409.23. The therapy time-reporting rules make clear that "[t]he time it takes to perform the formal initial evaluation and develop the treatment goals and the plan of treatment may not be counted as minutes of therapy received by the beneficiary." 64 Fed. Reg. at 41,661; *see also* RAI Manual, Ch. 3 at O-19 (Oct. 2014) ("the therapist's time spent on documentation or on initial evaluation is not included."). HHS has explained that "[t]his policy was established because we do not wish to provide an incentive for facilities to perform initial evaluations for therapy services for patients who have no need of those specialized services." 64 Fed. Reg. at 41,661. The purpose, however, is not to deprive providers of compensation for performing initial evaluation, because "the cost of the initial assessment is included in the payment rates for all Medicare beneficiaries in covered Part A SNF stays." *Id.* at 41661-62.

**2.      Medicare Part B**

47.     "Medicare Part B pays for outpatient rehabilitation services furnished to an

inpatient of a SNF who requires them but who has exhausted or is otherwise ineligible for benefit days under Medicare Part A." 42 C.F.R. § 410.60(b); *see also* Medicare Benefit Manual, Ch. 15, § 220.1.4; Medicare Claims Processing Manual, Ch. 7, § 10. Items or services provided to a Part B beneficiary must be reasonable and medically necessary. *See* 42 U.S.C. § 1395y(a).

48.     Part B payments are based on a fee schedule for the specific items or services provided. 42 U.S.C. § 1395yy(e)(9); Medicare Claims Processing Manual, Ch. 23, § 30. They are not, unlike Part A payments, based on a daily rate. "[W]here a fee schedule exists for the type of service, the fee amount will be paid. Where a fee does not exist on the Medicare Physician Fee Schedule (MPFS) the particular service is priced based on cost." Medicare Claims Processing Manual, Ch. 7, § 10.2; *see also* Medicare Claims Processing Manual, Ch. 23, § 30.

49.     Part B SNF claims are submitted on CMS-1450 using Healthcare Common Procedure Coding System (HCPCS) codes to report the number of units for outpatient rehabilitation services. 42 C.F.R. § 424.32; Medicare Claims Processing Manual, Ch. 7, § 20, *id.* at Ch. 23, §§ 20.3, 30; Medicare Claims Processing Manual, Ch. 5, § 20.2. HCPCS codes are based on CPT codes, Medicare Claims Processing Manual, Ch. 23, § 20.

50.     There are two types of HCPCS therapy codes: timed and untimed. Untimed codes are based on the number of times a procedure is performed in a day. Medicare Claims Processing Manual, Ch. 5, § 20.2. Time-based codes, such as outpatient therapy service codes, allow for variable billing that is based on 15-minute increments, where each increment is one (1) billing unit. *Id.* A provider can only bill for units of time that are spent in direct contact with the patient. *Id.*

51.     In 1998, Medicare established and published its own requirements regarding these

time-based 15 minute codes. *Id.* At the heart of these requirements is the 8-minute rule, which dictates that in order to bill for each additional time-based code, the therapist must spend at least eight (8) minutes of each unit providing direct service to the patient. The breakdown of these units is as follows:

| Units | Number of Minutes |
|---|---|
| 1 unit: | $\geq 8$ minutes through 22 minutes |
| 2 units: | $\geq 23$ minutes through 37 minutes |
| 3 units: | $\geq 38$ minutes through 52 minutes |
| 4 units: | $\geq 53$ minutes through 67 minutes |
| 5 units: | $\geq 68$ minutes through 82 minutes |
| 6 units: | $\geq 83$ minutes through 97 minutes |
| 7 units: | $\geq 98$ minutes through 112 minutes |
| 8 units: | $\geq 113$ minutes through 127 minutes |

52.     "All Part B claims for services furnished to SNF residents (whether filed by the SNF or by another entity) must include the SNF's Medicare provider number and appropriate HCPCS coding." 42 C.F.R. § 424.32(a)(5). Providers must certify the accuracy and completeness of the information contained on the CMS-1450. *See supra* at ¶ 45.

53.     Under Medicare Part B, CMS makes retrospective payments through MACs to Medicare providers for patient services. A MAC will review and approve claims submitted for reimbursement by Medicare providers and makes payments on those claims which appear to be eligible for reimbursement under the Medicare Program.

**3.      Medicare Cost Reports**

54.     Providers are required to submit cost reports on an annual basis, and must certify that the cost reports are "true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted." Providers

must also certify that "I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." 42 C.F.R. §§ 413.20(b), 413.24(d), (f). SNFs paid under the PPS may file a simplified cost report. 42 C.F.R. § 413.321.

## III. FACTS RELATING TO ALL COUNTS

### C.    Background Concerning Defendants' Organizational Structure, Chain of Command & Software System for Managing Therapists

55.    As stated above, Defendants Lichtschein and Scheiner own and operate through Advanced Healthcare Solutions, Texas Operations Management and various SNF LLCs some 54 Texas SNFs, the locations of which are shown on **Exhibit A** attached hereto. At each facility there is a Facility Administrator, a Director of Nursing and a Director of Rehab. At most of the facilities, the Director of Rehab and all rehabilitation therapists are employed by Defendant Rehab Synergies LLC. Rehabilitation therapists report to the Director of Rehab and receive their patient therapy schedules from the Director of Rehab.

56.    The facilities are organized into five regions and each Director of Rehab reports to a Regional Director, who may be located either at the Rehab Synergies "home office" in Richardson, Texas, or at one of the facilities in his/her region. The Regional Directors report to the Chief Operating Officer in the Richardson, Texas, office, who in turn reports to Lichtschein and Scheiner at Rehab Synergy's "principal place of business" in New City, New York or Advanced Healthcare Solutions' "principal place of business" in Monsey, New York.

57.    All corporate policies and instructions described in this complaint are handed down through the chain of command from Lichtschein and Scheiner in New York to the Chief Operating Officer in Richardson, Texas, who conveys them to the Regional Managers, who in

turn convey them to the Directors of Rehab at the several facilities. Individual rehabilitation therapists like the relators receive their instructions and policy statements from their Directors of Rehab and, to a lesser degree, from the regional managers.

58. Regional Directors hold weekly conference calls that are attended by all Directors of Rehab and/or by their assistants. Regional Directors also make in-person visits to the facilities every few weeks and communicate corporate goals and reports via e-mails sent to the Directors of Rehab. During each regional conference call, the Regional Director reviews with participants a report called the "Weekly Outcome Data" report, which compares key metrics for each of the facilities in the region, including "Part A Rate" (actual vs. budget), "RU %," "Productivity" (weekly and month to date), "PPS Overage" (minutes expended in excess of the maximum reimbursable) and "Missed Revenue" (revenue that would have been generated if the maximum reimbursable minutes had been billed).

59. At each facility, the Administrator also presides weekly over a financial meeting attended by the Director of Nursing and the Director of Rehab and their respective assistants. A profit and loss report is presented at each weekly financial meeting along with other reports measuring key metrics.

60. Individual rehabilitation therapists occasionally see the reports presented during the regional conference call and weekly financial meeting but more often are told by the Director of Rehab about Defendant's policies, goals and quotas as reflected in the reports presented at these meetings.

61. Rehabilitation therapists also interact with the Director of Rehab, and indirectly with all the management personnel in their chain of command, through a software system known

as Rehab Optima. Therapists use this system to record time, billing codes and a description of their services in an online form called "Treatment Encounter Notes" that is used by the Defendants to generate MDS assessments and bills to Medicare on CMS Form 1450.

62.     Rehabilitation therapists are reminded constantly by their home screen in Rehab Optima (the "My Workplace" tab) how many minutes they have worked ("Time in Facility"), how many minutes they have reported as billable therapy minutes ("Treatment Time") and their resulting productivity ratio ("Productivity"). If their productivity ratio is less than the 90% to 95% quota set by the Defendants, the percentage figure is displayed in red, indicating that the therapist is in danger of discipline; if their productivity ratio is above the 90% to 95% quota, the number is displayed in black, indicating that the therapist is meeting the Defendants' quota. Constantly viewing this warning in the software and hearing it repeated by the Director of Rehab has a profound effect on the therapists, causing them to be anxious at all times about meeting the 90% to 95% productivity quota.

63.     The Director of Rehab, Regional Director and other management personnel up the chain of command can log into Rehab Optima, view local data at a particular facility and generate management reports, including a Daily Activity Schedule, a Daily Treatment Log, a Service Log Matrix, a Census Details Report, a Census Summary, a KPI [key performance indicator] Summary, a KPI Monthly Detail, a KPI Scorecard with Employee Details, a KPI Site Trend Report, an Average Length of Stay Summary, the Average Length of Stay Details, the Average Length of Stay Trend, and similar management reports. All of these reports are used by management to put pressure upon Regional Directors, local Directors of Rehab and individual rehabilitation therapists to meet the Defendants' financial goals, targets and quotas, including

quotas for RU% and productivity.

64.     Although individual therapists conduct the initial evaluations of each new SNF

patient, the plans of care prepared by the therapists and approved by the facility's attending

physician do not specify the number of minutes of therapy a patient is to receive daily.  They

specific only the frequency of therapy (in days per week) and the proposed duration of the

therapy (in weeks).  Daily minutes of therapy assigned to each therapist for each patient, the

primary driver of Medicare reimbursement, are not approved in advance by either the evaluating

therapist or the facility's attending physician.  They are instead set daily by the Director of

Rehab using the Rehab Optima software, where they can be viewed either in the "Assignment

Board" tab on the therapist's home page or in a report called a Daily Activity Schedule that is

available for each discipline (physical therapy, occupational therapy and speech therapy).

**D.      Defendants Provide Medically Unnecessary or Unskilled Services Due to Their
         Practice of Presumptively Scheduling Patients for the Minimum Therapy Minutes
         Required to Obtain the Maximum Insurance Reimbursement**

65.     The Director of Rehab, who assigns daily therapy minutes for each patient,

typically knows little or nothing about the patient's clinical needs.  Therapy assignments are

driven instead by insurance and revenue considerations. The Director of Rehab is management's

on-site representative and schedules minutes of therapy to achieve management's revenue goals.

The number of minutes of therapy scheduled is based upon the minimum number of minutes

required to generate the maximum reimbursement by the patients' insurance.

66.     The scheduled minutes are highest when the patient is covered by Medicare Part

A.  The minutes of therapy scheduled for patients with Medicare Part A are presumptively set at

70 to 75 minutes per day each for two separate therapy disciplines such as physical therapy and

occupational therapy for a total of 140 to 150 minutes per day and at least 720 minutes per five-day week.

67.    The minutes of therapy scheduled for patients with Medicare Part B are presumptively set at 53 minutes per day (four units) for two separate therapy disciplines such as physical therapy and occupational therapy for a total of 106 minutes per day and at least 530 minutes per five-day week.

68.    The minutes of therapy scheduled for patients with Medicaid are presumptively set at 23 minutes per day (2 units) each for two separate therapy disciplines such as physical therapy and occupational therapy for a total of 46 minutes per day or 230 minutes per five-day week. Patients with Veterans Administration, workmen's compensation, or commercial insurance are likewise scheduled for the maximum number of minutes of therapy their insurance will allow.

69.    In other words Medicare Part B patients receive about 74% as much therapy as Part A patients and Medicaid patients receive only about 32% as much therapy as Part A patients, not because of their medical needs, but solely because of differences in what the various insurance programs will pay.

70.    For example, Patient #1, a Medicare Part A beneficiary, was scheduled for 75 minutes of physical therapy and 75 minutes of occupational therapy daily, despite being a frail, elderly man with end stage renal disease, diabetes and low oxygen levels. Therapists took him to the gym to do exercises, but were required to monitor his oxygen. He could not tolerate 75 minutes of therapy in one sitting, so the therapists were required to visit him multiple time per day to get in their minutes with him. The patient's condition was made worse by the high level

of exercise and he was found dead in the bathroom when a therapist returned to continue his therapy.

71.     Patient #2, a Medicare Part B beneficiary, was scheduled for 53 minutes of occupational therapy daily despite being an elderly person with severe dementia who had contractions and was curled up in the fetal position. The therapist who supposedly treated him 53 minutes per day spent all of her treatment time looking for splits that had been prescribed for the patient during an earlier period of skilled nursing care or talking with the nursing staff about those splints.

72.     Patient #3, a VA and Medicaid beneficiary, was initially scheduled for 20 to 45 minutes of therapy per day despite being very weak, lying in bed most of the time and suffering from cardiac arrhythmia and chronic pulmonary obstruction that made his oxygen levels very low. The nurse said that he was not going to get any better and he asked a therapist to kill him rather than continue to administer therapy. He was eventually sent to hospice care, yet he was initially scheduled for and received physical therapy simply because he had insurance that would pay for it5.

73.     In general, the consequences of the Defendants' focus upon reimbursement rather than their patients' needs include (1) providing of medically unnecessary therapy for end of life patients or those receiving palliative care only; (2) providing medically unnecessary therapy for patients unable to tolerate the therapy; (3) providing medically unnecessary therapy to patients actually harmed by the therapy; (4) providing medically unnecessary therapy, or therapy for an excessive duration, to patients who could not be reasonably expected to improve through therapy; (5) providing medically unnecessary therapy to patients who are severely demented,

unresponsive or asleep; and (6) providing medically unnecessary therapy through "modalities" so therapists can meet their targets for minutes when the patients actually do not benefit from the modalities.[1]

### E. Defendants' Presumptive Scheduling of Minutes at the Ultra High level Dramatically Increased their RU% between 2009 and 2014

74.     As therapists working in one of Defendants' facilities and observing practices at the Defendants' other facilities, the Relators have direct, first-hand knowledge that Defendants presumptively schedule patients for the highest level of reimbursement permitted by applicable insurance, routinely scheduling Medicare Part A patients for 70 to 75 minutes per day for two disciplines, Medicare Part B patients for 53 minutes, and Medicaid patients for 23 minutes. These anecdotal observations are confirmed by a review of non-public data reported in the Daily Activity Schedules and Service Log Matrixes generated by Defendants' Rehab Optima software.

75.     Relators' personal observations are further confirmed by an analysis of RU% data reported in the Defendants' Medicare cost reports. SNFs filing Medicare cost reports are required to report RU% data on Worksheet S-7. Prior to their purchase by Defendants in 2009, most of the facilities at issue in this case were billing approximately 52% of their Part A patients at the RU and RV levels. By 2014, the Defendants were billing approximately 87% of their Part A patients at the RU and RV reimbursement levels.[2] See **Exhibits C and D**.

---

[1] Treatment "modalities" are devices used to strengthen, relax, and heal muscles, including hot packs, cold packs, ultrasound, transcutaneous electrical nerve stimulation and other forms of electrical stimulation.
[2] For purposes the public disclosure bar, the publicly-available Medicare cost report data does not by itself provide sufficient information to permit the government to draw an inference of fraud as the increase in RU% could have resulted from a change in patient mix, patient need or other factors. However, Relators know from their own personal observations that the increase in RU% does not result from any such factors, but is driven instead by Defendants' management practices, including their emphasis upon meeting targets for "Part A Rate" and "RU%" (Ultra High percent) as reported in the Weekly Outcome Data reports. Accordingly, there has been no public disclosure of the "allegations or transactions" at issue in this proceeding and, in any event, Relators qualify as original sources.

76.     Accordingly, Relators believe and therefore allege that Defendants' business model consists of purchasing poorly-performing but previously honest facilities and turning them around financially by, *inter alia*, providing patients the most-expensive levels of care for which Medicare provides reimbursement, rather than providing the levels of care most suitable for each patient's medical needs.

**F.     Defendants Caused Their Therapists to Bill for Non-Reimbursable Time**

77.     Defendants require that their therapists achieve 90% to 95% "productivity" on penalty of termination.  Productivity is defined as therapy time divided by compensable time at work.  Thus, if a therapist works 100 minutes, allocates 90 to 95 of those minutes to patient rehabilitation therapy and allocates five minutes to administrative tasks such as completion of required reports, she has satisfied the 90% to 95% productivity requirement.  If she works 100 minutes, but allocates only 75 minutes to therapy and 25 minutes to other responsibilities, then she has a 75% productivity ratio and is subject to discipline.

78.     Therapists employed by Defendants have numerous responsibilities in addition to providing billable rehabilitation services to patients.  Those duties include the following tasks for which the Relators have been instructed to include their time as billable rehabilitation services:

      a.  Preparing progress reports, which are due every week for Medicare managed care Part A and Part B patients;

      b.  Evaluating Medicaid patients every 10th visit for potential Medicare Part B coverage and generating of required "g-codes" for such patients;

      c.  Recertification and/or re-evaluation of Medicare patients, required every 30 days, including coordination with the nursing staff to obtain a telephone order

from the supervising physician;

    d.  Preparation of discharge reports, which require coordination with the nursing staff to obtain a telephone order from the supervising physician and documentation of a restorative nursing program to be implemented after discharge;

    e.  Generating restorative nursing programs ("RNPs") to serve as a carryover within the facility after discharge of patients, which requires use of an Internet-based computing platform different from Rehab Optima and requires signatures from RNP staff and a registered nurse, usually the Director of Nursing, who is always busy.

79.    In addition to the foregoing, for which the Relators have received specific instructions to include their administrative time as billable therapy minutes, therapists spend time on the following tasks that are not properly billable as therapy time, but are nevertheless billed as therapy in order to meet the Defendants' 90% to 95% productivity quota:

    f.  Locating patients, whether in their rooms or other areas within the facility, or if a patient cannot be found in the facility, checking the appointment book to determine whether he may be out for a doctor's appointment;

    g.  Locating chairs in the patients' bedrooms, the hallways or the rehab room, or, if the patient does not have a chair assigned to him, locating a chair to be assigned to the patient or temporarily borrowing one;

    h.  Transferring patients from bed to chair or vice versa, which occupational and physical therapists are permitted to do, although speech therapists are required

to obtain assistance from a certified nursing assistant or a rehab team member;

i.  Lifting patients via a Hoyer lift, which has to be located in a hallway or may already be in use, a task that requires a two man team, for which assistance is not always readily available;

j.  Seeing patients multiple times during the same day because the patients cannot tolerate the total assigned minutes in one session;

k.  Having therapy sessions interrupted and having to locate patients to complete their therapy sessions because a doctor is in the building and the patients are taken by the certified nursing assistant or nurse to see the doctor;

l.  Speaking to nurses regarding patients' health and safety and taking time to ensure patients are not left alone after therapy is completed due to fall risk, reduced oxygen level, assistance with dining, feeling ill etc.;

m. Locating nurses to sign seven-day trials; for example occupational and physical therapists could be working with a patient using a cane or walker; a telephone order must be obtained by a nurse from the supervising physician and the therapist must educate the certified nursing assistants and nurses at that time;

n.  Locating nurses for other telephone orders by the supervising physicians, including diet change, texture trials, change of utensils, swallow studies and dietary communication; nurses are not very cooperative and "available" for signatures, so it may take multiple attempts to get anything signed; and

o.  Assisting other patients the therapist might be passing by in order not to

neglect them, which occurs all the time due to fall risks, family visitors, transfers etc.

80.     Other consequences of the 90% to 95% productivity rule are (1) the reporting of estimated or rounded minutes to meet the productivity target or the reporting of a suspiciously consistent pattern of minutes; (2) reporting minutes for unskilled services such as palliative care, i.e. back rubbing, holding the hand of a near-death patient, writing progress notes or doing nothing patient-related; (3) reporting minutes for unskilled services provided to patients who do not require skilled therapy services such as speech therapy; (4) reporting skilled therapy minutes for unskilled services provided to patients who are asleep, severely disoriented or otherwise unable to engage in therapy; (5) reporting skilled therapy minutes for unskilled services provided to patients such as repetitive exercises, routine transfers in and out of bed, dressing, toileting, feeding, or bathing; (6) reporting skilled therapy minutes for unskilled services provided to patients in the use of stationary bicycles, assisted pedaling devices, standing frames etc. for patients who are severely disoriented or otherwise unable to engage in therapy; and (7) reporting minutes for services not actually provided, including patients not actually treated because they are asleep, severely disoriented or otherwise unable to engage in therapy.

**G.     Defendants Have Engaged in Other Unlawful Conduct**

81.     Defendants have engaged in other unlawful practices, including (1) continuing patients in therapy after the treating rehabilitation therapists have reported that the patient has reached maximum improvement and should be discharged from further therapy or turned over to the nursing staff for unskilled "restorative therapy;" (2) scheduling rehab minutes without input from the therapists, or over their objections or in disregard of their recommendations, schedule,

holidays or the patient's refusal; (3) giving higher priority to therapy for Medicare Part A patients and delaying care for patients with other insurances; (4) giving higher priority to therapy for Medicare Part A patients in assessment reference periods: (5) asking that therapists troll through the facility's Medicaid patients screening for patients to be billed for therapy minutes under Medicare Part B; (6) requiring therapists to approach patients multiple times per day if therapy is refused or the patient cannot tolerate all of the scheduled therapy in one session; (7) telling therapists not to waste time on "over delivery" or "overages" by performing services for patients who have already met their target for therapy minutes, even though additional therapy would otherwise be justified; (8) if the target for minutes is not met one day, making up missed minutes by scheduling patients for more minutes the next day, whether the patient will benefit from the extra therapy or not; (9) switching therapists assigned to a particular patient if the first therapist recommends discharge; (10) shifting treatment minutes between types of therapy to meet targets for minutes and minimize costly speech therapy; (11) ramping up the number of minutes of therapy scheduled for patients during their assessment reference periods in order to meet targets; (12) spiking or sudden, financially-driven increases or decreases in the amounts of therapy on the last day of an assessment period; (13) pushing modalities upon therapists as a way to meet targets for billable minutes and achieve the maximum reimbursement; (14) telling therapists to do whatever it takes or to think creatively about how to achieve scheduled minutes; (15) threatening directors and therapists with sanctions, including termination, if they fail to meet their targets for minutes; and (16) ignoring complaints that pressure to meet targets is undermining therapists' clinical judgment or violating Medicare rules.

## H.     Defendants' False Statements and Claims

82.     At all times relevant to this Complaint, Lichtschein and Scheiner's local SNF LLCs, acting through the centralized billing office of Advanced Healthcare Solutions and/or Texas Operations Management, electronically submitted Medicare claims to an intermediary or MAC, who then submitted claims for payment to Medicare.

83.     In order to do so, each local SNF LLC was required to enter into an Electronic Data Interchange ("EDI") Enrollment Agreement, whereby the SNF LLC agreed to "submit claims that are accurate, complete, and truthful[.]" It also acknowledged that

> [A]ll claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law[.]

84.     To the extent that it did not submit claims electronically, the central billing office submitted paper claims on Form CMS-1450 (UB-04), each of which contained the following certification and/or acknowledgement:

> **Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.**

They also contained the following notice:

> **UB-04 NOTICE: THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).**

(Emphasis in original).

85.     The centralized billing and accounting office of Lichtschein, Scheiner, Advanced Healthcare Solutions and Texas Operations Management also filed an annual cost report for each local SNF LLC with its IF or MAC. Each such SNF LLC, through its administrator or the chain organization's chief financial officer, was required to certify as follows:

> I hereby certify that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet Statement of Revenue and Expenses prepared by _____ (Provider Name(s) and Number(s)) for the cost reporting period beginning ___ and ending ___ and that to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

42 C.F.R. § 413.24(f)(4)(iv).

86.     As set out above, Defendants' certifications were false. Their cost reports were not true, correct or complete and the services identified were not provided in compliance with applicable healthcare laws and regulations governing billing for rehabilitation services in the SNF setting.

87.     These fraudulent claims resulted in Defendants obtaining and keeping Medicare funds that they were not entitled to receive, for care that was neither reasonable nor medically necessary and for administrative time of therapists that was not reimbursable.

**I.     Defendants False Statements and Claims Were Material**

88.     Defendants' false statements in their treatment encounter notes, their minimum data sets and their Medicare cost reports, and their false claims submitted on Form CMS-1450, its electronic counterpart or the Medicare cost report, were all material to Medicare's decision

either to pay the claims or to not seek reimbursement for claims previously paid because such false statements and documents would have a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

89.     Furthermore, CMS does not routinely pay Medicare claims of SNFs known to have abused Medicare's RUG classification system, to have provided rehabilitation services in excess of those medically required or to have billed for rehabilitation services based upon minutes actually expended on administrative matters rather than treatment. In fact, the Government has recently pursued FCA claims against several corporate nursing home providers and rehabilitation providers involving similar allegations, demonstrating that the Government deems such matters highly material.[3]

## J.     Defendants Acted Knowingly

90.     Defendant Advanced Healthcare Solutions and Texas Operations Management acted with actual knowledge of the falsity of the RUG and billing information submitted to Medicare's FIs or MACs, or acted in deliberate ignorance or reckless disregard of the truth or falsity of that information, because (1) these management entities employed the central billing office personnel who submitted the claims to Medicare; (2) they implemented the policies developed by Lichtschein and Scheiner that caused excessive and medically unnecessary rehabilitation services to be rendered and/or non-reimbursable administrative time to be billed as rehabilitation services, (3) they regularly generated and reviewed financial and management reports that showed the sensitivity of the chain's Medicare revenues to manipulation of the

---

[3] *See, e.g., U.S. ex rel. Martin v. Life Care Centers of America*, No. 1:09-cv-251, USDC Eastern District of Tennessee; *U. S. ex rel. Ribik v. HCR Manorcare, Inc. et al*, No. 1:09-cv-13, USDC Eastern District of Virginia; *U.S. ex rel. Haywood v. SavaSeniorCare, LLC, et al.*, No. 3:11-cv-0821, USDC Middle District of Tennessee; and *U.S. ex rel. Halpin v. Kindred Healthcare, Inc. et al*, No. 1:11-cv-12139, USDC District of Massachusetts.

RUGs and employee productivity measures;  (4) they regularly communicated with Defendants Lichtschein and Scheiner about these matters.

91.      Defendants Lichtschein and Scheiner acted with actual knowledge of the falsity of the RUG and billing information submitted to Medicare's FIs or MACs, or acted in deliberate ignorance or reckless disregard of the truth or falsity of that information, because (1) they acted as the chief executive officers of all legal entities at issue herein; (2) they developed the policies that caused excessive and medically unnecessary rehabilitation services to be rendered and/or non-reimbursable administrative time to be billed as rehabilitation services, (3) they regularly reviewed financial and management reports that showed the sensitivity of the chain's Medicare revenues to manipulation of the RUGs and employee productivity measures; and (4) they regularly communicated with personnel in the central billing office about these matters.

92.      Defendant Rehab Synergies acted with actual knowledge of the falsity of the RUG and billing information submitted to Medicare's FIs or MACs, or acted in deliberate ignorance or reckless disregard of the truth or falsity of that information, because (1) it's Chief Operating Officer, Regional Managers and local Directors of Rehab implemented the policies developed by Lichtschein and Scheiner that caused excessive and medically unnecessary rehabilitation services to be rendered and/or non-reimbursable administrative time to be billed as rehabilitation services, (2) they regularly reviewed financial and management reports that showed the sensitivity of the SNF chain's Medicare revenues to manipulation of the RUGs and employee productivity measures; and (3) they regularly communicated with Lichtschein and Scheiner or personnel in the central billing office about these matters.

93.     The Defendant SNF LLCs acted with actual knowledge of the falsity of the RUG and billing information submitted to Medicare's FIs or MACs, or acted in deliberate ignorance or reckless disregard of the truth or falsity of that information, because (1) these operating entities employed the local Administrator and MDS Coordinator who submitted the false claims to Medicare through the central billing office; (2) they implemented the policies developed by Lichtschein and Scheiner that caused excessive and medically unnecessary rehabilitation services to be rendered and/or non-reimbursable administrative time to be billed as rehabilitation services, (3) they regularly reviewed financial and management reports that showed the sensitivity of the chain's Medicare revenues to manipulation of the RUGs and employee productivity measures;  (4) they regularly communicated with the Regional Directors of Rehab Synergies and the management personnel of Defendants Advanced Healthcare Solutions and Texas Operations Management about these matters.

## K.     The SNF LLCs are a Sham Used to Perpetrate a Fraud

94.     Relators re-allege and incorporate by reference the allegations above.

95.     As shown by the foregoing allegations and those that follow, defendants Lichtschein and Scheiner have used their affiliated limited liability companies as shams to perpetrate a fraud upon Medicare for their benefit.

96.     Lichtschein and Scheiner have engaged in business with Medicare through the SNF defendants that were seriously undercapitalized as legal entities considering the level of business they expected to conduct with Medicare.  As shown by the Medicare cost report data on **Exhibit B**, the defendant SNFs have billed Medicare $149 million to $194 million per year from 2009 through 2014, yet have ended that period with a negative member equity of approximately

$6.5 million.

97.     The SNF defendants have negative member equity because they have had all their revenues and assets siphoned off through above-market rents, management fees, service charges or salaries charged by Lichtschein and Scheiner, or by other legal entities owned and controlled by Lichtschein and Scheiner, such that the SNF LLCs barely broke even in 2010 and 2011 and incurred operating losses annually from 2012 through 2014, all as shown by the Medicare cost report data on **Exhibit B**.

98.     Accordingly, the separate existence of the LLC defendants must be disregarded as a matter of Texas law.

## COUNT I
## FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FALSE OR FRAUDULENT CLAIMS (31 U.S.C. §3729(a)(1)(A))

99.     Relators re-allege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

100.    Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval by the United States, in violation of 31 U.S. C. §3729(a)(1)(A), specifically, claims for payment to Medicare for medically unreasonable and unnecessary rehabilitation therapy.

101.    As a result of these false claims, the United States has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT II
## FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FALSE RECORDS & STATEMENTS (31 U.S.C. §3729(a)(1)(B))

102.    Relators re-allege and incorporate by reference the allegations above.

103. Defendants knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), specifically false treatment encounter notes, minimum data sets and Medicare cost reports.

104. As a result of these false claims, the United States has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT III
## DEFENDANTS' RETENTION AND CONCEALMENT OF OVERPAYMENTS IN VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3729(A)(1)(G)

105. Relators restate and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

106. As set forth above, Defendants knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money to the United States by submitting false Medicare cost reports in which they falsely certified that all health care services identified in the cost report were provided in compliance with the laws and regulations regarding provision of healthcare services, thereby keeping Medicare funds that they were not entitled to receive or retain for care that was neither reasonable nor medically necessary and for administrative time of therapists that was not reimbursable.

107. Defendants knew that they were not entitled to moneys paid by Medicare for care that was neither reasonable nor medically necessary and for administrative time of therapists that was not reimbursable, but concealed and avoided their obligation to repay such amounts through their false certifications when their Medicare cost reports were filed.

108. By virtue of Defendants' knowing concealment and avoidance of their obligation

to pay money to the United States, the United States has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT IV
## DISREGARD OF CORPORATE EXISTENCE OF SNF LLCS USED AS A SHAM TO PERPETRATE A FRAUD
## CASTLEBERRY V. BRANSCUM, 721 S.W.2D 270 (TEX. 1986)

109. Relators restate and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

110. As set forth above, Defendants Lichtschein and Scheiner have knowingly and willfully used the SNF defendants as shams to perpetrate a fraud upon Medicare for the personal benefit of Lichtschein and Scheiner.

111. The defendant SNFs, which hold Medicare Provider numbers and do business with Medicare, were all undercapitalized at the outset and have subsequently had all their revenues and assets siphoned off through above-market rents, management fees, service charges or salaries charged by Lichtschein and Scheiner, or other legal entities owned and controlled by Lichtschein and Scheiner, such that the SNFs have liabilities exceeding their assets and are unable to respond in judgement.

112. Recognizing the separate corporate existence of the defendant SNFs would bring about an inequitable result in violation of the doctrine announced by the Texas Supreme Court in *Castleberry v. Branscum*, 721 S.W.2d 270 (Tex. 1986).

## PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants jointly and severally for Counts I-IV, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b)     That civil penalties of $11,000 ($21,563 for conduct after November 2, 2015) be imposed for each and every false claim that Defendants presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable Attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case;

(d)     That the Relators be awarded the maximum percentage of any recovery allowed to him pursuant the False Claims Act, 31 U.S.C. §3730(d)(1)&(2); and

(e)     That this Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

Relators, on behalf of themselves and the United States, demand a jury trial on all claims alleged herein.

Dated:  September 16, 2016                    Respectfully submitted,

                                              **WATERS & KRAUS LLP**


By: _Wm. Paul Lawrence, II_
Wm. Paul Lawrence, II
Texas Bar #24004130
3219 McKinney Ave.
Dallas, TX 75204
or

37163 Mountville Road
Middleburg, Virginia 20117
Telephone: (214) 357-6244
Direct: (540) 687-6999
plawrence@waterskraus.com

**LAW OFFICES OF JEFFREY A. NEWMAN & ASSOCIATES**

One Story Terrace,
Marblehead MA 01945 (mailing address)
60 State Street, Suite 700
Boston MA 02120
Telephone: 617-823-3217
Direct: 781-639-8677;
jeffrey.newman1@gmail.com

Attorneys for Plaintiff/Relators

# Exhibit A

## Exhibit A – SNF Defendant Names, Locations & Provider Nos.

| | Rehab Synergy Staffs | SNF Legal Name | Facility Trade Name | Address1 | Address2 | County | U.S. Court District | U.S. Court Division | Medicare Provider Number | NPI Number |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Yes | Balch Springs SNF LLC | Balch Springs Nursing Home | 4200 Shepherd Lane | Balch Springs, TX 75180 | Dallas | Northern | Dallas | 675057 | 1518291004 |
| 2 | Yes | Bay Oaks SNF LLC | Bay Oaks Healthcare - The Lakes at Texas City | 424 N. Tarpey Rd. | Texas City, TX 77591 | Galveston | Southern | Galveston | 455490 | 1275867624 |
| 3 | Yes | Baylor SNF LLC | Seymour Rehab & Healthcare | 1110 Westview Drive | Seymour, TX 76380 | Baylor | Northern | Dallas | 675042 | 1982960712 |
| 4 | Yes | Bellmire SNF LLC | Bellmire Health Care Facilities | 1101 Rock St. | Bowie, TX 76230 | Montague | Northern | Montague | 455849 | 1679809909 |
| 5 | Yes | Benbrook SNF LLC | Benbrook Nursing & Rehab | 1020 McKinley Street | Benbrook, TX 76126 | Tarrant | Northern | Forth Worth | 675096 | 1689001151 |
| 6 | | Birmingham SNF LLC | Birmingham Health Care Center | 1183 Johnson Dr | Buda, TX 78785 | | Eastern | | 455976 | 1790017221 |
| 7 | | | Birmingham Health Care Center | | | | | | | |
| 8 | Yes | BOWIE SNF LLC | Advanced Rehab & Healthcare of Bowie | 700 U.S. Hwy 2875 | Bowie, TX 76230 | Montague | Northern | Wichita Falls | 675849 | 1568734812 |
| 9 | Yes | BRADY WEST SNF LLC | Brady West Rehab & Nursing | 2201 Menard Hwy | Brady, TX 76825 | McCulloch | Western | Austin | 676284 | 1932453578 |
| 10 | Yes | Clarksville SNF LLC | Clarksville Nursing Center | 300 E. Baker Street | Clarksville, TX 75426 | Red River | Eastern | Texarkana | 455985 | 1033889469 |
| 11 | Yes | Clyde SNF LLC | Clyde Health Care Center | 806 Stephens St. | Clyde, TX 79510 | Callahan | Northern | Abilene | 675928 | 1609102185 |
| 12 | Yes | Colonial Manor NH SNF LLC | Colonial Manor Cleburne | 2035 N. Granbury Street | Cleburne, TX 76031 | Johnson | Northern | Dallas | 455631 | 1780910273 |
| 13 | Yes | Colonial Manor SNF LLC | Colonial Manor Healthcare | 209 W. Hackberry Ave. | McAllen, TX 78501 | Hidalgo | Southern | McAllen | 675044 | 1245566736 |
| 14 | Yes | Courtyard SNF LLC | Courtyard Convalescent Center | 7499 Stanwick Dr. | Houston, TX 77087 | Harris | Southern | Houston | 455613 | 1588990071 |
| 15 | Yes | Crockett SNF LLC | Crockett Care Center of Crockett | 1150 Loop 304 E. | Crockett, TX 75835 | Houston | Eastern | Tyler | 455577 | 1437595824 |
| 16 | Yes | Crowell SNF LLC | Crowell Nursing Dr. | 200 South "B" Ave.(670) | Crowell, TX 79227 | Foard | Northern | Wichita Falls | 675013 | 1982939376 |
| 17 | Yes | El Paso SNF LLC | El Paso Health & Rehabilitation Center | 11525 Vista Del Sol Drive | El Paso, TX 79936 | El Paso | Western | El Paso | 455935 | 1124552901 |
| 18 | Yes | Gardendale SNF LLC | Gardendale Rehabilitation & Nursing Center | 1521 E. Rusk St. | Jacksonville, TX 75765 | Cherokee | Eastern | Tyler | 455517 | 1437485935 |
| 19 | Yes | GARLAND SNF. LLC | Advanced Healthcare & Rehab Center of Garland | 505 W. Centerville Rd. | Garland, TX 75041 | Dallas | Northern | Dallas | 455731 | 1073837449 |
| 20 | Yes | GRANBURY SNF LLC | Granbury Rehab & Nursing | 2124 Paluxy Hwy. | Granbury, TX 76048 | Hood | Northern | Fort Worth | 455929 | 1639423270 |
| 21 | Yes | Green Oaks SNF LLC | Green Oaks Rehab & Nursing | 500 Valle Vista | Athens, TX 75751 | Henderson | Eastern | Tyler | 455992 | 1891049446 |
| 22 | Yes | Greenville SNF LLC | Greenville Health & Rehab Center | 4910 Wellington | Greenville, TX 75402 | Hunt | Northern | Dallas | 675920 | 1205162534 |
| 23 | Yes | Henderson SNF LLC | Henderson Health & Rehab Center | 1010 W. Main Street | Henderson, TX 75652 | Rusk | Eastern | Tyler | 455986 | 1992031322 |
| 24 | Yes | Keller SNF LLC | Heritage House of at Keller Rehab & Nursing | 1150 Whitley Road | Keller, TX 76244 | Tarrant | Northern | Fort Worth | 675153 | 1033362397 |
| 25 | Yes | Lubbock NH SNF LLC | Lubbock Health Care Center | 4120 22nd Pl. | Lubbock, TX 79410 | Lubbock | Northern | Lubbock | 455562 | 1124553902 |
| 26 | Yes | McAllen SNF LLC | McAllen Nursing Center | 600 N. Cynthia Blvd | McAllen, TX 78501 | Hidalgo | Southern | McAllen | 455590 | 1538231184 |
| 27 | Yes | MESQUITE NH SNF LLC | Mesquite Tree Nursing Center | 434 Paza Dr. | Mesquite, TX 75149 | Dallas | Northern | Dallas | 675033 | 1598091936 |
| 28 | Yes | Monterey SNF LLC | Monterey Care Center | 3101 10th St. | Wichita Falls, TX 76300 | Wichita | Northern | Wichita Falls | 675852 | 1033445473 |
| 29 | Yes | Munday SNF LLC | Munday Nursing Center | 421 W. "F" St. Box 199 | Munday, TX 76371 | Knox | Northern | Dallas | 675061 | 1518293901 |
| 30 | Yes | Palo Pinto SNF LLC | Palo Pinto Rehab & Nursing Center | 200 SW 25th Avenue | Mineral Wells, TX 76067 | Palo Pinto | Northern | Fort Worth | 455961 | 1063748457 |
| 31 | Yes | Paris SNF LLC | Heritage House of Paris | 1505 S.W. 47th Street | Paris, TX 75460 | Lamar | Eastern | Sherman | 676294 | 1518229301 |
| 32 | Yes | Park View SNF LLC | Parkview Care Center | 3301 View Street | Fort Worth, TX 76103 | Tarrant | Northern | Fort Worth | 455606 | 1134455587 |
| 33 | Yes | Pinecrest SNF LLC | Pinecrest Nursing & Rehab Center | 3505 Old Jacksonville Rd. | Tyler, TX 75701 | Smith | Eastern | Tyler | 675289 | 1447586805 |
| 34 | Yes | Pittsburg SNF LLC | Pittsburg Nursing Center | 123 Pecan Grove | Pittsburg, TX 75686 | Camp | Eastern | Marshall | 675037 | 1417283085 |
| 35 | Yes | Prairie House SNF LLC | Prairie House Living Center | 1301 Mesa Drive | Plainview, TX 79072 | Hale | Northern | Lubbock | 675478 | 1053647495 |
| 36 | Yes | Prairie House SNF LLC | The Residence at Parker Park | 2428 Buckner Drive | Dallas, TX 75215 | Dallas | Northern | Dallas | 455650 | 1053697359 |
| 37 | Yes | River Oaks SNF LLC | River Oaks Care Center | 100 Bailey Ave | Wichita Falls, TX 76301 | Wichita | Northern | Wichita Falls | 675029 | 1467687368 |
| 38 | Yes | Rosenberg SNF LLC | Rosenberg Health & Rehab Center | 1419 Mahlmann Street | Rosenberg, TX 77471 | Ft. Bend | Southern | Houston | 675046 | 1891021242 |
| 39 | Yes | | Cherokee Trade Rehab & Healthcare | 300 Kelly Rd. | | Cherokee | Eastern | Tyler | | 1447284674 |
| 40 | Yes | Santa Fe SNF LLC | Santa Fe Health & Rehab Center | 1205 Santa Fe Drive | Weatherford, TX 76086 | Parker | Northern | Fort Worth | 455957 | 1629363305 |
| 41 | Yes | Stonebrook SNF LLC | Stonebrook Healthcare Center | 4801 E. Saratoga Boulevard | Corpus Christi, TX 78412 | Nueces | Southern | Corpus Christi | 675285 | 1396071759 |
| 42 | Yes | Stonebrook Manor SNF LLC | Stonebrook Manor at Broadway | 1841 Flamingo | San Antonio, TX 78209 | Bexar | Western | San Antonio | 675437 | 1477889830 |
| 43 | Yes | Sulphur Springs SNF LLC | Sulphur Springs Health & Rehab | 411 Airport Road | Sulphur Springs, TX 75482 | Hopkins | Eastern | Sherman | 455579 | 1285988832 |
| 44 | Yes | Tomball SNF LLC | Tomball Rehab & Nursing | 815 N. Peach Street | Tomball, TX 77375 | Harris | Southern | Houston | 675714 | 1972629242 |
| 45 | Yes | Vernon SNF LLC | Vernon Care Center | 4401 College Drive | Vernon, TX 76384 | Wilbarger | Northern | Wichita Falls | 455931 | 1871629242 |
| 46 | Yes | Vista Hills SNF LLC | Vista Hills Health Care Center | 10599 Socorro Road | El Paso, TX 79935 | El Paso | Western | El Paso | 455593 | 1548961998 |
| 47 | Yes | | | | | | Western | El Paso | | |
| 48 | Yes | Wedgewood SNF LLC | Wedgewood Nursing Home | 6621 Dan Danciger Road | Fort Worth, TX 76133 | Tarrant | Northern | Fort Worth | 455572 | 1174857676 |
| 49 | Yes | WHISPERING OAKS SNF LLC | Whispering Oaks Rehab & Nursing | 105 Hospital Drive | Cuero, TX 77954 | DeWitt | Southern | Victoria | 675134 | 1053666512 |
| 50 | Yes | White Settlement SNF LLC | White Settlement Nursing Center | 7820 Skyline Park | White Settlement, TX 76108 | Tarrant | Northern | Fort Worth | 455475 | 1780910174 |
| 51 | Yes | WHITEHALL SNF LLC | Whitehall Rehab & Nursing | 1116 C. Loop 304 | Crockett, TX 75835 | Houston | Eastern | Lufkin | 675624 | 1851645410 |
| 52 | Yes | WILLOW SNF LLC | Willow Rehab & Nursing | 1901 Whippoorwill | Kilgore, TX 75662 | Gregg | Eastern | Tyler | 676007 | 1639423262 |
| 53 | Yes | WINFIELD SNF LLC | Winfield Rehab & Nursing | 1108 E. Loop 304 | Crockett, TX 75835 | Houston | Eastern | Lufkin | 675976 | 1093609668 |
| 54 | Yes | Wichita Falls SNF LLC | Advanced Rehab & Healthcare of Wichita Falls | 4816 Kemp Blvd. | Wichita Falls, TX 76308 | Wichita | Northern | Wichita Falls | 675852 | 1033445473 |

Facilities highlighted in yellow bill under same provider number.

Monterey & River Oaks facilities highlighted in gold were replaced by Advanced Rehab & Healthcare of Wichita Falls, which bills under the Monterey provider number.

Facilities highlighted in green are low occupancy facilities acquired in 2009 that show different ownership now and may have been sold in late 2014

May be billing under another facility's provider number

# Exhibit B

# Exhibit B -- 54 SNFs Consolidated

## Exhibit B -- Assets, Liabilities, Revenues & Expenses Per Medicare Cost Reports

| Description | 2009 | 2010 | 2011^ | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Total Assets (Worksheet G, line 34)* | NA | $36,037,882 | $23,742,528 | $32,167,870 | $38,672,436 | $37,016,843 | NA |
| Total Liabilities (Worksheet G, line 51)** | NA | ($30,396,495) | ($19,912,042) | ($28,432,906) | ($38,677,856) | ($43,550,617) | NA |
| Member Equity (Worksheet G, line 59, Total Fund Balances)*** | NA | $6,517,783 | $3,830,486 | $3,734,964 | ($5,420) | ($6,533,774) | NA |
| | | | | | | | |
| Total Patient Revenues (Worksheet G-3, line 1) | NA | $220,446,883 | $142,805,083 | $245,001,522 | $284,842,629 | $254,400,526 | NA |
| Less Allowances & Discounts on Patient Accounts (Worksheet G-3, line 2) | NA | ($11,036,236) | ($6,255,397) | ($23,867,331) | ($29,490,746) | ($46,839,114) | NA |
| Net Patient Revenues (Worksheet G-3, line 3) | NA | $209,410,647 | $136,549,686 | $221,134,191 | $255,351,883 | $207,561,412 | NA |
| | | | | | | | |
| Less Total Operating Expenses (Worksheet G-3, line 4) | NA | ($205,468,940) | ($134,556,024) | ($222,618,879) | ($260,255,813) | ($210,865,377) | NA |
| Plus Other Income (Worksheet G-3, line 25)**** | NA | ($147,647) | ($408,269) | ($5,391) | ($1,337,045) | ($1,477,974) | NA |
| Less Other Expenses (Worksheet G-3, line 30)***** | NA | $0 | $0 | $0 | $0 | $0 | NA |
| Net Income (Worksheet G-3, line 31)****** | NA | $3,795,224 | $1,585,393 | ($1,490,079) | ($6,240,975) | ($4,781,939) | NA |
| | | | | | | | |
| Estimated Part A % of Patient Revenues @ 28% | NA | $61,451,131 | $39,985,423 | $68,600,426 | $79,755,936 | $71,232,147 | NA |
| Estimated Part B % of Patient Revenues @ 40% | NA | $87,787,330 | $57,122,033 | $98,000,609 | $113,937,052 | $101,760,210 | NA |
| Estimated Total Medicare % of Revenues @ 68% | NA | $149,238,461 | $97,107,456 | $166,601,035 | $193,692,988 | $172,992,358 | NA |

* Line 33 on Cost Reports 2010 and prior

** Line 50 on Cost Reports 2010 and prior

*** Line 58 on Cost Reports 2010 and prior

**** Line 26 on Cost Reports 2010 and prior

***** Line 31 on Cost Reports 2010 and prior

****** Line 32 on Cost Reports 2010 and prior

^2011 cost report data is missing for at least 15 SNFs that reported in the previous and following year. Therefore, all figures for 2011 are seriously understated.

# Exhibit C

**Exhibit C -- 33 SNFs Acquired 2009 and held through 2014**

Balch, Bay Oaks, Bellmire, Bowie, Clarksville, Clyde, Colonial Manor SNF, Courtyard, Crowell, El Paso, Gardendale, Garland, Greenville, Henderson, McAllen, Mesquite, Monterray, Palo Pinto, Park View, Pinecrest, Renaissance, River Oaks, Rosenberg, Southeast, Stone Brook, Sulphur Springs, Vernon, Vista Hills, Waco, Wedgewood, White Settlement & Wichita Falls

**Exhibit C -- RUG Data from Medicare Cost Reports, Worksheet S-7**

| Days by RUG Classification | 2009 | % | 2010 (Dec.1--Dec.31) | % | 2011* | % | 2012 | % | 2013 | % | 2014 | % | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RUX | 2,801 | 2.1% | 2,747 | 2.1% | 2,029 | 2.3% | 2,697 | 2.3% | 1,527 | 1.4% | 690 | 0.8% | NA |
| RUL | 5,003 | 3.8% | 2,495 | 1.9% | 513 | 0.6% | 879 | 0.7% | 837 | 0.8% | 334 | 0.4% | NA |
| RUC | 5,453 | 4.1% | 7,160 | 5.5% | 14,421 | 16.2% | 27,085 | 22.9% | 24,849 | 22.9% | 21,024 | 25.2% | NA |
| RUB | 12,326 | 9.3% | 9,365 | 7.2% | 11,769 | 13.2% | 21,526 | 18.2% | 23,778 | 21.9% | 18,297 | 20.9% | NA |
| RUA | 6,219 | 4.7% | 6,159 | 4.7% | 8,760 | 9.8% | 16,982 | 14.4% | 21,308 | 19.6% | 18,522 | 21.2% | NA |
| Total RU | 31,802 | 23.9% | 27,926 | 21.4% | 37,492 | 42.2% | 69,169 | 58.5% | 72,299 | 66.6% | 59,867 | 68.4% | NA |
| RVX | 4,665 | 3.5% | 3,753 | 2.9% | 538 | 0.6% | 395 | 0.3% | 281 | 0.3% | 112 | 0.1% | NA |
| RVL | 4,171 | 3.1% | 3,287 | 2.5% | 268 | 0.3% | 294 | 0.2% | 101 | 0.1% | 105 | 0.1% | NA |
| RVC | 7,380 | 5.5% | 11,520 | 8.8% | 9,454 | 10.6% | 9,332 | 7.9% | 8,018 | 7.4% | 5,999 | 6.9% | NA |
| RVB | 13,734 | 10.3% | 12,755 | 9.8% | 6,536 | 7.3% | 6,815 | 5.8% | 4,208 | 3.9% | 4,264 | 4.9% | NA |
| RVA | 7,943 | 6.0% | 10,321 | 7.9% | 5,501 | 6.2% | 7,299 | 6.2% | 5,968 | 5.5% | 5,607 | 6.4% | NA |
| Total RV | 37,893 | 28.4% | 41,636 | 31.9% | 22,297 | 25.1% | 24,135 | 20.4% | 18,576 | 17.1% | 16,087 | 18.4% | NA |
| Total RU & RV | 69,695 | 52.3% | 69,562 | 53.3% | 59,789 | 67.2% | 93,304 | 78.9% | 90,875 | 83.7% | 75,954 | 86.8% | NA |
| Total All Days (WK S-7, line 100) | 133,222 | | 130,484 | | 88,943 | | 118,246 | | 108,631 | | 87,476 | | NA |

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| RU% | 23.9% | 21.4% | 42.2% | 58.5% | 66.6% | 68.4% | |
| RV% | 28.4% | 31.9% | 25.1% | 20.4% | 17.1% | 18.4% | |
| Total | 52.3% | 53.3% | 67.2% | 78.9% | 83.7% | 86.8% | |

* 10 of the 33 SNFs did not file cost reports in 2011. They are Bay Oaks, Clyde, Colonial Manor NH, Courtyard, Gardendale, Park View, Renaissance, Sulphur Springs, Wedgewood & White Settlement.

# Exhibit D



EXHIBIT D

33 ADVANCED HCS SNFS ACQUIRED DEC. 2009 & HELD INTO 2014 OR LATER

PERCENT OF RUGS THAT WERE RU (BLUE) & RV (RED)

2009 FIGURES REPRESENT PRIOR OWNER